The STATE HOUSE, Inc.
v.
UNITED STATES.
Cong. No. 14–55.

United States Court of Claims.
Jan. 15, 1958.

George P. Lemm, Washington, D. C., for plaintiff. Francis P. Noonan, Washington, D. C., was on the briefs.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen., Perry W. Morton, for defendant.

MADDEN, Judge.

We have this case pursuant to H.Res. 290, 84th Cong., 1st sess., the purport of which Resolution is shown in finding 2.* The case has to do with the Government's negotiating for, but never legally consummating, a lease on an apartment building in Washington, D. C., which building was under construction for the plaintiff in 1950. On October 30, 1950, when the building was 73 percent completed, the Government's General Services Administration (GSA), which has the task of acquiring space for occupancy by Government agencies, was looking for additional space because of the expansion of Government activities resulting from the war in Korea.

A GSA representative inquired of the plaintiff as to the possibility of leasing the apartment building for Government occupancy. The plaintiff was willing, but the parties recognized that there were problems, one of which was whether the Federal Housing Administration (FHA), would be willing to guarantee the mortgage on the property if it was to be occupied by the Government, and not by private tenants. This question and the numerous details about the elimination and storage of kitchen equipment and lighting fixtures, the extent to which the bathrooms were to be left unfinished, etc., accounted for a long period of negotiation.

On January 18, 1951, the plaintiff sent to GSA a written offer to lease the apartment building for $400,000 a year. GSA decided to advertise for space. The plaintiff bid in response to the advertisement, again offering its building for $400,000 a year. GSA prepared a lease of the plaintiff's building and began to put it through the necessary channels for approval and execution. It did not send the lease to the plaintiff.

In the meantime, late in February, and in March and early April, 1951, the Armed Services Committee of the House of Representatives was taking an interest in GSA's acquisition of additional office space, and on April 3 the Committee concluded that the leasing of apartment buildings for office space was uneconomical and unwise, and wrote a letter to the Secretary of Defense so advising him. GSA thereupon notified the plaintiff that it would not lease the plaintiff's building.

During the period of several months in which both the plaintiff and GSA thought that GSA, either by a negotiated lease or by eminent domain, would acquire the occupancy of the plaintiff's building, work on the building was carried on on the assumption that it was to be occupied by the GSA as office space. The water and waste pipes that would have emerged from the walls for the connection of fixtures were cut or left in the walls and plastered over. The painting of the rooms was done according to the directions of GSA. The kitchen equipment was taken to storage off the premises. A complicated and expensive special telephone installation was ordered from the telephone company and largely completed.

When it was decided that GSA would not lease the plaintiff's building, the things that had been done on the assumption that the lease would be made had to be undone, and the building had to be completed for household occupancy by private tenants. This reconversion took money, and time. The significance of the time was, of course, that it delayed the

---

*2. This action was filed pursuant to Resolution 290, of the United States House of Representatives, agreed to on July 19, 1955. The resolution directs this court to report findings of fact and conclusions as shall be sufficient to inform the Congress of the nature and character of the demand of the plaintiff as a legal or equitable claim and the amount, if any, legally or equitably due to the plaintiff from the United States.

completion of the building and its occupancy by rent paying tenants.

The plaintiff says that the conversion and reconversion delayed the completion of the building for 5 months; that its net rentals would have been $336,682 per annum, or $140,284.15 for the 5 months. The Government says that the delay was much less than that, and points to several other causes of delay which had no relation to the abortive negotiations for the lease. The plaintiff claims this lost rent, as well as some $110,000 of out-of-pocket expense incurred in preparing the building for Government use and later reconverting it for private use. The items of that expense are listed in finding 53.† As will appear hereinafter, we find it unnecessary to resolve the question of how long occupancy was delayed by the conversion and reconversion.

The plaintiff's offer, made on January 18, 1951, proposed a lease for 1 year, renewable at the option of the Government from year to year up to April 1, 1956. GSA's draft of a lease, never submitted to the plaintiff, was for an initial term beginning April 1, 1951, and ending June 30, 1951, with an option in the Government to renew from year to year thereafter, on giving 90 days' notice. We suppose that the terms and dates proposed by the Government were intended to set the periods according to the Government's fiscal year. We are not told whether it would have been legally impossible for the first period of the lease to extend into the following fiscal year. We suppose that the plaintiff would not have been willing to undergo the expense of the conversion with no contractual assurance of more than 3 months' rent from the Government.

We know, however, from the plaintiff's own offer of January 18, 1951, that it would have been willing to give GSA a lease for 1 year, with no assurance that it would be renewed. If then, the lease had been made as the plaintiff desired to make it, it would have terminated at the end of the year, unless the Government elected to renew it. On its termination, the plaintiff would have had to make the same expenditures for reconverting the apartment building for private household occupancy that it had to make in the instant case. Rent paying occupancy by private tenants would have been delayed for the same length of time while the reconversion was being carried out. That means, of course, that the plaintiff, in being willing to make a 1-year lease, contemplated amortizing the anticipated ultimate expense of reconversion as far as possible during that year, and, as to the rest of it, speculated on the well

† 53. By reason of changes incident to preparing its unfinished building for office use and later reconverting for apartment use, resulting in a five-month delay in completion, the plaintiff reasonably and necessarily expended or lost the following amounts:

| | | |
|---|---|---:|
| 1. | Extra painting and plastering | $27,760.64 |
| | [painting ............ $24,572.34] | |
| | [plastering ........... 3,188.30] | |
| 2. | Extra plumbing charges | 46,250.59 |
| 3. | Asphalt tile flooring | 501.20 |
| 4. | Kitchen trim and crating equipment | 1,023.96 |
| 5. | Reassembling gas ranges | 175.04 |
| 6. | Moving kitchen equipment to storage and return | 5,344.00 |
| 7. | Extra cleaning and debris removal | 862.00 |
| 8. | Extra to architect, superintendent, rent for construction office and telephone | 9,140.33 |
| | Subtotal Items 1–8 | 91,057.76 |
| 9. | Overhead: 7½% of $91,057.76 | 6,829.33 |
| 10. | General contractor's fee: 6% of $91,057.76 | 5,463.47 |
| 11. | Rent for storage kitchen equipment—5 months at $1,250 | 6,250.00 |
| 12. | Insurance on stored equipment | 364.92 |
| 13. | Blueprints furnished GSA | 88.00 |

The amount of rent which the plaintiff would have received from private tenants during the period in question was $336,682 per year.

founded probability that GSA, once it occupied the building, would renew its lease one or more times after the first year.

If the 1-year lease offered by the plaintiff had in fact been made, and if the Government had vacated the property at the end of the year, the plaintiff would have had neither a legal nor equitable claim to recover its unamortized costs of reconversion. It would merely be in a position of having its well founded expectations disappointed.

When one considers that the plaintiff, if it had obtained the Government's signature on the lease which it was willing to make, would have subjected itself to the same expenses of storage and reconversion, and would have faced the same period of loss of rent while the building was being reconverted for private occupancy, one wonders why the plaintiff was willing to make such a lease. The answer must be that the lease to the Government at $400,000 a year compared to leasing to private tenants at $336,682 a year would have been enough more profitable to the plaintiff to justify this additional expense and loss of rent at the end of the Government's occupancy. Since that occupancy could, according to the lease tendered by the plaintiff, have terminated at the end of 1 year, it is apparent, as we have seen, that the plaintiff was counting on several renewals by the Government to make up the part of the expense and loss which it would not recover during the year of the lease.

The plaintiff's loss from the failure of the Government to accept the contemplated lease was the difference in rentals between the amount provided in that lease and the amount which would have been received from private tenants during the period of the lease. That difference is $63,318. The computation of the difference in rental cannot be carried beyond 1 year because, as we have seen, the plaintiff, if the contemplated lease had been executed, would have had neither a legal nor moral right to insist that the Government renew its lease and make further payments of rent.

The completion of the building according to the Government's specifications, rather than according to the plaintiff's original plan, was done because both the plaintiff and the Government assumed that they could agree on the terms of a lease, and that the lease would be made. The Government's representatives in the negotiation had authority to execute a lease. The consummation of the transaction did not fail because higher authority whose approval was necessary finally disapproved the contract. Cf. Kilmer Village Corporation v. United States, Ct.Cl., 153 F.Supp. 393. It failed because of the interposition of a *force majeure*, the expressed opinion of a Committee of the House of Representatives. The plaintiff acted, not without reason, on the assumption that since it was dealing with those who had legal authority to make the lease, the lease would be made. It was not made and the plaintiff lost $63,318 because it had acted upon that assumption. Our conclusion is that the plaintiff has an equitable claim for that amount, if we use the expression "equitable claim" in the sense of one founded upon morality and good conscience. We so report to the House of Representatives.

It is so ordered.

JONES, Chief Judge, REED, Justice (Ret.), sitting by designation, and WHITAKER, and LITTLETON, Judges, concur.